JUDGE SWAIN

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------X
FAIRSTAR HEAVY TRANSPORT N.V.,

        Plaintiff,

    - against -

FAIRMOUNT MARINE B.V.,

        Defendant.
-----------------------------------------------------------X

08 CV 7044

08 Civ.

ECF CASE

## VERIFIED COMPLAINT

Plaintiff, FAIRSTAR HEAVY TRANSPORT N.V., (hereinafter "Fairstar" or "Plaintiff"), by and through its attorneys, Lennon, Murphy & Lennon, LLC, as and for its Verified Complaint against the Defendant, FAIRMOUNT MARINE B.V., (hereinafter "Fairmount" or "Defendant") alleges, upon information and belief, as follows:

1.    This is an admiralty and maritime claim within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure and 28 United States Code § 1333. Jurisdiction over this matter is also present pursuant to the Federal Arbitration Act, 9 United States Code § 1 *et seq.*, and this Court's federal question jurisdiction, 28 United States Code § 1331.

2.    At all times material to this action, Plaintiff, formerly known as Fairmount Heavy Transport N.V., was, and still is, a foreign public company organized and existing under Dutch law with a principal place of business in Rotterdam, The Netherlands. Plaintiff is a publically traded company that is listed on the Oslo Stock Exchange in Norway. The main corporate activity of Plaintiff is the worldwide commercial operation of seagoing vessels capable of transporting heavy loads for the offshore industry.

3.    At all times material to this action, Defendant was, and still is, a foreign corporation, or other business entity, organized and existing under Dutch law with a principal

place of business in Rotterdam, The Netherlands. Defendant is a maritime services provider who, *inter alia*, operates five seagoing tugs and several semi-submersible barges.

4.    Plaintiff purchased two semi-submersible barges, named the Fjord and the Fjell, in order to convert them into self-propelled seagoing vessels.

5.    This action concerns disputes under a Management Agreement dated June 30, 2005, later amended on July 20, 2006, under which contract Plaintiff outsourced the entire management of its commercial activities to Defendant. Under that Management Agreement Defendant was charged with, and accepted responsibility for, the conversion of the Fjord and the Fjell from semi-submersible barges into self-propelled seagoing vessels. In addition, under the Management Agreement Defendant was responsible for the commercial operation of those vessels after the conversions had been completed. Also under the Management Agreement, Defendant was responsible for the day-to-day management of Plaintiff's operations. *A copy of the Amended Management Agreement dated July 20, 2006, together with Plaintiff's letter to Netherlands Arbitration Institute dated June 18, 2008 commencing Rotterdam arbitration and summarizing claims and damages, is annexed hereto as Exhibit "1".*

6.    Defendant has egregiously breached its obligations under the Management Agreement. Defendant was negligent in selecting a shipyard to effect the vessel conversions. Specifically, the shipyard selected by Defendant to carry out the conversions lacked the experience and expertise to successfully complete the job, was inadequately capitalized, and was poorly managed. This resulted in excessive delays and cost overruns.

7.    Additionally, Defendant failed to competently supervise the conversions and failed to obtain the necessary performance guarantee from the shipyard. Defendant's appointed marine engineer, who was responsible to oversee the conversion and to liaise with the shipyard

2

for the work on the Fjord and Fjell, badly mismanaged the project. On numerous occasions he unnecessarily changed the design plans but only after the shipyard had already commenced the conversion work based upon on the original design plans. In effect, therefore, Defendant's marine engineer repeatedly changed the conversion designs after works had already been performed, thereby requiring work to be undone and/or repeated.

8.    As represented by Defendant to Plaintiff, the conversion schedule of the Fjord was to take a total of nine months such that delivery was to have taken place no later than December 2006. Delivery of the Fjell was to take place six months later. Neither of the conversions was completed on time as promised by Defendant.

9.    As a matter of necessity, Defendant was removed from the conversion process. The Management Agreement was therefore terminated in August 2007 with six months notice. The Management Agreement expired on January 23, 2008, by which time Plaintiff assumed all corporate tasks itself.

10.   As a result of Defendant's breach of the Management Agreement, the conversions of the Fjord and the Fjell have been faced with huge cost overruns as well as serious delays totaling approximately one and a half years. By way of example, at the time when the Fjord should have been completed and delivered, the conversion process was not only far from completed, but also the vessel was in a disastrous state of repair. Consequently, the task of completing the conversions has since been assumed by Plaintiff.

11.   As a consequence of Defendant's breach of the Management Agreement by failing to competently perform the vessel conversions, Plaintiff has suffered damages. The major part of these damages, *i.e.*, $58,900,000 (EUR 38,000,000) relates to loss of revenue for the Fjord and the Fjell as a result of the significant delays caused by Defendant's

mismanagement. These damages are calculated on the basis of a conservative rate of $50,000 per day per vessel, which is what these vessels would have been earning but for Defendant's breach of contract. Additionally, as a result of Defendant's breach, Plaintiff was forced to enter into a settlement agreement with the shipyard in respect of the unauthorized design changes inflicted under Defendant's supervision at a cost of $4,650,000 (EUR 3,000,000).

12.     Subsequent to its removal as the conversion manager, Defendant acted in violation of a number of its other duties under the Management Agreement, among others by negotiating a commercial charter agreement with Heerema Marine Contractors (HMC) on behalf of Plaintiff for a charter rate that was far below the market rate. Defendant negotiated this discount to HMC at Plaintiff's expense in order to settle an unrelated dispute between Defendant and HMC. Plaintiff has thus been disadvantaged by Defendant's management and has suffered damages as a result of Defendant's arrangement with HMC in the amount of $2,000,000 (EUR 1,290,323).

13.     On April 28, 2008, Plaintiff submitted a Notice of Claim to Defendant, confirming that Defendant was liable for any and all damages, expenses, costs, including legal costs, that Plaintiff suffered as a result of Defendant's mismanagement and breach of fiduciary duty under the Management Agreement. By letter dated May 16, 2008, Defendant denied responsibility.

14.     Plaintiff has suffered damages as a result of Defendant's breach of the Management Agreement in the principal amount of $66,092,500 (EUR 42,640,322) which includes the following claims:

        (1)     $2,000,000 (EUR 1,290,323) for commercial loss as a result of the unauthorized discount Defendant has granted to HMC under the HMC contract;

4

(2)    $4,650,000 (EUR 3,000,000) for additional costs in reaching a necessary settlement with the shipyard on delays caused by unapproved and improper Variation Orders issued under Defendant's command and control;

(3)    $31,000,000 (EUR 20,000,000) for loss of revenue for the Fjord due to failure by Defendant to timely deliver the vessel, which is conservatively calculated at $50,000/day for 620 days;

(4)    $27,900,000 (EUR 18,000,000) for loss of revenue for the Fjell due to the delays caused by Defendant in mismanaging the conversion process, which is conservatively calculated at USD 50,000/day for 558 days; and

(5)    $542,500 (EUR 350,000) for extra costs and expenses paid by Plaintiff's to resume, resurrect and save the conversion process.

15.    Pursuant to Article 13 of the Management Agreement, disputes between the parties are to be submitted to arbitration in Rotterdam with Dutch law to apply. The parties have agreed that the Netherlands Arbitration Institute will provide the forum for the arbitration. Plaintiff has duly commenced arbitration against Defendant in Rotterdam where Defendant has appeared and is defending. Defendant is raising jurisdictional defenses in the arbitration.

16.    Furthermore, in an effort to obtain pre-judgment security for its claims, Defendant has applied to the District Court of Amsterdam for an order of attachment against the assets of Defendant in the amount of EUR 50,000,000 ($77,500,000). Today the District Court of Amsterdam issued the requested attachment order, That Order is presently being served on potential garnishees, *i.e.* banks, within The Netherlands. No funds have been attached.

17.    Interest, costs and attorneys' fees are routinely awarded to the prevailing party under Dutch Law in Rotterdam arbitration.

18. As best as can now be estimated, Plaintiff expects to recover the following amounts at arbitration as the prevailing party:

| | | |
|---|---|---|
| a. | Plaintiff's principal claim as enumerated above: | $66,092,500; |
| b. | Interest for 3 years at 5.25% compounded quarterly: | $10,965,635; |
| c. | Estimated arbitration costs and recoverable legal fees: | $441,865; |
| **Total:** | | **$77,500,000.** |

19. This action is brought in order to obtain jurisdiction over Defendant and also to obtain security for Plaintiff's claims and in aid of the ongoing Rotterdam arbitration proceedings.

20. The Defendant cannot be found within this District within the meaning of Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims of the Federal Rules of Civil Procedure, but, upon information and belief, Defendant has, or will have during the pendency of this action, assets within this District and subject to the jurisdiction of this Court, held in the hands of one or more garnishees which are believed to be due and owing to the Defendant. *See Affidavit in Support of Prayer for Maritime Attachment annexed hereto as Exhibit "2".*

21. The Plaintiff seeks an order from this court directing the Clerk of Court to issue Process of Maritime Attachment and Garnishment pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims, attaching, *inter alia*, any proeprty of the Defendant held by any garnishee within the District for the purpose of obtaining personal jurisdiction over the Defendant, and to secure the Plaintiff's claims as described above.

**WHEREFORE**, Plaintiff prays:

6

A.     That process in due form of law issue against the Defendant, citing it to appear
and answer under oath all and singular the matters alleged in the Verified Complaint;

B.     That pursuant to 9 U.S.C. §§ 201. *et seq.* and/or the doctrine of comity this Court
recognize and confirm any foreign judgment or arbitration award rendered on the claims had
herein as a Judgment of this Court;

C.     That since the Defendant cannot be found within this District pursuant to
Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims, this Court issue
an Order directing the Clerk of Court to issue Process of Maritime Attachment and Garnishment
pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims,
attaching all tangible or intangible property of the Defendant within the District, including but
not limited to any funds held by any garnishee, which are due and owing to the Defendant, up to
the amount of **$77,500,000** to secure the Plaintiff's claims, and that all persons claiming any
interest in the same be cited to appear and pursuant to Supplemental Admiralty Rule B answer
the matters alleged in the Complaint;

D.     That this Court enter Judgment against Defendant on the claims set forth herein;

E.     That this Court retain jurisdiction over this matter through the entry of any
judgment or award associated with any of the claims currently pending, or which may be
initiated in the future, including any appeals thereof;

F.     That this Court award Plaintiff its attorney's fees and costs of this action; and

G.     That the Plaintiff have such other, further and different relief as the Court
may deem just and proper.

Dated: August 4, 2008

The Plaintiff,
FAIRSTAR HEAVY TRANSPORT N.V.

By: _____

Charles E. Murphy
Anne C. LeVasseur
LENNON, MURPHY & LENNON, LLC
420 Lexington Ave., Suite 300
New York, NY 10170
(212) 490-6050 – phone
(212) 490-6070 – fax
cem@lenmur.com
acl@lenmur.com

## ATTORNEY'S VERIFICATION

State of Connecticut )
                    )    ss.:    Town of Southport.
County of Fairfield )

1.   My name is Charles E. Murphy.

2.   I am over 18 years of age, of sound mind, capable of making this

Verification, and fully competent to testify to all matters stated herein.

3.   I am an attorney in the firm of Lennon, Murphy & Lennon, LLC, attorneys for the

Plaintiff.

4.   I have read the foregoing Verified Complaint and know the contents

thereof and believe the same to be true and accurate to the best of my knowledge, information

and belief.

5.   The reason why this Verification is being made by the deponent and not

by the Plaintiff is that the Plaintiff is a business organization with no officers or directors now

within this District.

6.   The source of my knowledge and the grounds for my belief are the

statements made, and the documents and information received from, the Plaintiff and agents

and/or representatives of the Plaintiff.

7.   I am authorized to make this Verification on behalf of the Plaintiff.

Dated: August 4, 2008

Charles E. Murphy

9

# EXHIBIT 1

# ALLEN & OVERY

BY EMAIL AND BY REGISTERED MAIL

Allen & Overy LLP
Apollolaan 15
1077 AB  Amsterdam

Postbus 75440
1070 AK  Amsterdam

Tel  020 674 1000
Fax 020 674 1111

Nederlands Arbitrage Instituut (NAI)
Attn. Secretariat NAI
P.O. Box 21075
3001 AB ROTTERDAM
The Netherlands

secretariaat@nai-nl.org

| | |
|---|---|
| Amsterdam, | June 18, 2008 |
| Subject | **Fairstar Heavy Transport N.V. / Fairmount Marine B.V. – Request for arbitration** |
| Our ref. | 88536-00003 AMCO:1976421.1 |
| From | J.D. Kleyn, advocaat |
| | G. te Winkel, advocaat |
| Telephone | +31 (0)20 674 1333 / 1285 |
| Facsimile | +31 (0)20 674 1034 / 1827 |
| Email | johan.kleyn@allenovery.com / gerjanne.tewinkel@allenovery.com |

Dear Madam, Dear Sir,

On behalf of Fairstar Heavy Transport N.V. (**FHT**), we submit a request for arbitration in connection with a dispute with the Dutch private limited liability company Fairmount Marine B.V. (**Fairmount Marine**). This request will be further elaborated below.

## 1.    PARTIES

(a)    FHT

1.1    Claimant FHT is a Dutch public company, with its registered office in Rotterdam, The Netherlands, and a listing on the Oslo Stock Exchange in Norway. The main corporate activity of FHT is the worldwide commercial operation of seagoing vessels capable of transporting heavy loads for the offshore industry. To this end, FHT has purchased two semi-submersible barges, named the Fjord and the Fjell, in order to convert them into self-propelled seagoing vessels. At the time of this request, the conversion of the Fjord has been completed. The conversion of Fjell is in progress and is expected to be completed by the end of 2008.

Allen & Overy LLP is een maatschap met beperkte aansprakelijkheid geregistreerd in Engeland en Wales onder nummer OC306763 en geregistreerd door de Solicitors Regulation Authority van Engeland en Wales. De term partner of compagnon wordt gebruikt om een lid van Allen & Overy LLP aan te duiden of een werknemer of consultant van gelijke stakding en kwalificaties. Een lijst van de leden van Allen & Overy LLP en van de niet-leden die als partners worden aangeduid ligt ter inzage op onze plaats van vestiging te Londen, One Bishops Square, Londen E1 6AO, en op ana Amsterdamse kantoor.

Allen & Overy LLP of een daarmee verbonden kantoor heeft vestigingen in de volgende steden: Abu Dhabi, Amsterdam, Antwerpen, Bangkok, Boedapest, Bratislava, Brussel, Dubai, Düsseldorf, Frankfurt, Hamburg, Hongkong, Londen, Luxemburg, Madrid, Mannheim, Milaan, Moskou, New York, Parijs, Peding, Praag, Riyad (verbonden kantoor), Roma, Shanghai, Singapore, Tokio en Warschau.

# ALLEN & OVERY

1.2     The Managing Board of FHT consists of three members, i.e. its CEO – Mr. P.J. Adkins, its CFO – Mr. C.J.C. Du Marchie Sarvaas and Mr. W. Out. FHT has a Supervisory Board, consisting of Messrs. F. van Riet (Chairman), W. Dirkzwager (Vice-Chairman), J.J.H. Verhagen and L.O. Aaker.

1.3     FHT's current contact information is:

Fairstar Heavy Transport N.V.
6th Floor, Suite E6.170
Conradstreet 18
3013 AP Rotterdam
The Netherlands
P.O. Box 2225
3000 CE Rotterdam
The Netherlands

Telephone:      +31 (0)10 403 5333
Facsimile:      +31 (0)10 403 5344
Email:          fairstar@fairstar.com

Commercial Registry file n°:   24380374

1.4     In this matter, FHT is represented by:

Allen & Overy LLP
Mr. J.D Kleyn and Ms. G. te Winkel
Apollolaan 15
1077 AB Amsterdam
The Netherlands
P.O. Box 75440
1070 AK Amsterdam
The Netherlands

Telephone:      +31 (0)20 674 1333 / 1285
Facsimile:      +31 (0)20 674 1034 / 1827
Email:          johan.kleyn@allenovery.com / gerianne.tewinkel@allenovery.com

(b)     Fairmount Marine

1.5     Respondent Fairmount Marine is a maritime service provider operating five seagoing tugs and several semi-submersible barges. In addition, Fairmount Marine operates an agency for the Japanese company Fukada Salvage & Marine Works Co. Ltd. Until May 31, 2007, Fairmount Marine was owned by Fairmount Marine Investments B.V. (**Investments**). Investments' shares are indirectly held by Mr. H.J. van den Berg (**Van den Berg**). On May 31, 2007, Fairmount Marine was sold to the French ship-owner Louis Dreyfus Armateurs (**LDA**). Fairmount Marine is still managed by Van den Berg. Upon the sale of Fairmount Marine to LDA, Investments changed its corporate name to Oude Maas Beheer B.V.

ALLEN & OVERY

1.6    Fairmount Marine's current contact information is:

Fairmount Marine B.V.
Hofpoort 16th floor
Hofplein 20
3032 AC Rotterdam
The Netherlands

Telephone:         +31 (0)10 240 2500
Facsimile:         +31 (0)10 240 2599
E-mail:            fairmount@fairmount.nl

Commercial Registry file nº:  24175350

1.7    In this matter, Fairmount Marine is represented by:

Nauta Dutilh N.V.
Messrs. R.B. Gerretsen and G.J.R. Kalsbeek
Weena 750
3014 DA Rotterdam
The Netherlands
P.O. Box 1110
3000 BC Rotterdam
The Netherlands

Telephone:         +31 (0)10 224 0000 / 0614
Facsimile:         +31 (0)10 414 8444 / 224 0006
Email:             bart.gerretsen@nautadutilh.com / rutger.kalsbeek@nautadutilh.com

## 2.    BRIEF DESCRIPTION OF THE DISPUTE

(a)    Management Agreement between FHT and Fairmount Marine

2.1    FHT was incorporated by Investments on July 8, 2005. Initially, FHT was factually managed by Van den Berg, who outsourced the entire management of FHT's operational activities to Fairmount Marine. To this end, a management agreement was concluded on June 30, 2005, which agreement was later amended by an agreement dated July 20, 2006 (**Management Agreement**). Under the Management Agreement, Fairmount Marine accepted and carried responsibility for the conversion of the Fjord and the Fjell into self-propelled seagoing vessels. In addition, after the completion of the conversion, Fairmount Marine would also be responsible for the commercial operation of the vessels. In fact, Fairmount Marine took care of, and carried responsibility for, the entire day-to-day management of FHT's operations.

(b)    Breach of the Management Agreement by Fairmount Marine

2.2    Fairmount Marine has egregiously breached it obligations under the Management Agreement. As a result, the conversion of the Fjord and the Fjell has been faced with huge cost overruns as well as serious delays totalling approximately one and a half years. At the time that the Fjord should have been completed and delivered, the conversion process was not only far from completed, but also in a disastrous

# ALLEN & OVERY

state due to the malperformance of Fairmount Marine. Fairmount Marine was therefore removed as manager of the conversion process. This task has henceforth been assumed by FHT itself.

2.3  Under the Management Agreement, Fairmount Marine remained responsible for a number of tasks, amongst which the commercial relations of FHT. Subsequent to its removal as a conversion manager, Fairmount Marine acted in violation of a number of its other duties under the Management Agreement, amongst others by negotiating a commercial charter agreement with Heerema Marine Contractors (HMC) on behalf of FHT for a price far below the market. FHT has strong indications that Fairmount Marine negotiated this discount at the cost of FHT in order to settle an unrelated dispute between Fairmount Marine itself and HMC.

    (c)  Notice of Liability

2.4  On April 28, 2008, FHT submitted a Notice of Claim to Fairmount Marine, confirming that Fairmount Marine was liable for any and all damages, expenses, costs, including legal costs, that FHT suffered as a result of Fairmount Marine's mismanagement and breach of fiduciary duty under the Management Agreement. By letter of May 16, 2008, Fairmount Marine has denied responsibility.

## 3.  QUANTUM OF DAMAGES OF FHT

3.1  FHT's damages total an amount of approximately EUR 42.640.322,=, which includes, but is not limited to, the following claims:

    (1)  USD 2,000,000 (approximately EUR 1,290,322) for commercial loss as a result of the unauthorised discount Fairmount Marine has granted to HMC under the HMC contract;

    (2)  EUR 3,000,000 for in additional costs for reaching a necessary settlement with the shipyard on delays caused by unapproved and improper Variation Orders issued under Fairmount Marine's command and control;

    (3)  EUR 20,000,000 for in loss of revenue for the Fjord due to failure by Fairmount Marine to timely deliver the vessel (conservatively calculated at USD 50,000/day EBITDA).

    (4)  EUR 18,000,000 for in loss of revenue for the Fjell due to the delays caused by Fairmount Marine in mismanaging the conversion process (conservatively calculated at USD 50,000/day EBITDA); and

    (5)  EUR 350,000 for in extra costs and expenses made by FHT's new management to save and turn around the conversion process.

## 4.  ARBITRATION AGREEMENT

4.1  Article 13 of the Management Agreement (**Appendix 1**) provides that:

    (a)  Dutch law is applicable to the Management Agreement;

    (b)  disputes, if not settled amicably, will be settled through arbitration;

    (c)  the place of the arbitration shall be Rotterdam; and

# ALLEN & OVERY

    (d)    the parties will jointly appoint three arbitrators.

4.2    The Management Agreement does not specify a forum for the arbitration. The parties agreed, however, that the Netherlands Arbitration Institute (*Nederlands Arbitrage Instituut*) (NAI) will serve as such. The parties have not been able to reach an agreement on the language applicable to the arbitration proceedings. Accordingly, FHT request that the arbitrators rule on the applicable language.

4.3    For the joint appointment of the three arbitrators, it is proposed that the list procedure as specified in Article 14 of the Arbitration Rules of the NAI be applied.

Based on the foregoing, FHT respectfully requests the Secretariat of the NAI to process this arbitration request and to take any such action as may be conducive to the swift appointment of the three arbitrators. In accordance with Article 6 subparagraph 4 of the Arbitration Rules, FHT additionally requests the NAI to confirm the receipt of this arbitration request at the earliest occasion.

Yours sincerely,

J.D. Kleyn
G. te Winkel

Copy to:           Fairmount Marine B.V.
                    Attn. de heer H.J. van den Berg
                    Hofpoort 16th floor
                    Hofplein 20
                    3032 AC Rotterdam
                    The Netherlands

Copy to:           Nauta Dutilh N.V.
                    Attn. mr. R.B. Gerretsen en mr. G.J.R. Kalsbeek
                    Weena 750
                    3014 DA Rotterdam
                    The Netherlands

# ALLEN & OVERY

## APPENDIX 1

## MANAGEMENT AGREEMENT

This Agreement is dated 20 July 2006.

1.  Fairmount Heavy Transport NV, a company under establishment and to be incorporated and existing under the laws of The Netherlands and to have its registered office at Beurs, World Trade Center # 1459, 3001 DE Rotterdam, The Netherlands (hereinafter referred to as "OWNER"), and

2.  Fairmount Marine BV, a company incorporated and existing under the laws of The Netherlands and having its registered office at Beurs, World Trade Center # 1459, 3001 DE Rotterdam, The Netherlands (hereinafter referred to as "MANAGER")

WHEREAS:-



1.  OWNER intends to convert two barges (BOA barges 19 and 20) into semisubmersible heavy transportation Vessels (hereinafter referred to as "Vessel" when in singular and "Vessels" when in plural),

2.  OWNER intends to employ the Vessels in the heavy transportation market; typically including jack up drilling rigs, semisubmersibles, floating production Vessels, TLPs, Spars, modules, dredgers, docks, cranes, etc., all of which requires special means of transportation.

3.  MANAGER has the expertise in managing and supervising the design, engineering, procurement, construction, completion follow-up, operation and marketing of the Vessels and all associated services connected thereto.

4.  OWNER appoints MANAGER to perform management of the Vessels, all as herein provided, and MANAGER accepts such appointment on the terms and conditions hereinafter set forth.

Now therefore it is agreed as follows:-

0   Definitions

    0.1   In addition to the expressions defined above, the expression "Transportation Contract" means any such contract entered into from time to time with respect to hire, performance and use of the Vessels; normally on a lumpsum basis.

    0.2   References to Clauses and Sub-Clauses are, unless otherwise stated, are references to Clause and Sub-Clauses of this Management Agreement.

    0.3   Except where the context otherwise requires, references to any person and/or company include its successors and permitted assignees.

1.0   Appointment of Authorisation

OWNER hereby appoints MANAGER and MANAGER hereby agrees to act as manager in respect of the Vessels from the date of this Management Agreement, and on the terms and conditions set forth herein.

MANAGER is authorised to act on behalf of OWNER in all matters that pertain to the everyday management or supervision of the design, engineering, procurement, construction, completion, and operation of the Vessels, and in all such matters that as are otherwise in this Management Agreement expressed to fall within MANAGER's Scope of Work as set out in Clause 2, and in respect of matters which MANAGER is specifically authorised in writing, provided always that, notwithstanding anything in this Management Agreement to the contrary, MANAGER has in all events a right and obligation immediately to perform such acts as cannot be postponed in order to safeguard the interests of OWNER, or avert danger to life and health, or damage to the Vessels, or property, or the environment.

2.0    Scope of Work

MANAGER shall on OWNER's behalf (until the termination of this Management Agreement under the terms hereof):-

o        supervise the design, construction and completion of the Vessels,

o        procure the necessary design and engineering work for developing the Vessels to complete semisubmersible heavy transportation vessels, including supervise design of, procurement to, if applicable, installation on, and outfitting, construction, testing and completion of the Vessels, all of which to be further defined in the Building Contract with the Builder,

o        manage the engineering and operation of the Vessels under all heavy transportation contracts and other potential usages of the Vessels



all:-

(i)       as fully set out in Sub-Clause 2.1 - 2.16,

(ii)      in accordance with sound vessel management practices,

(iii) by an organization properly staffed with qualified personnel and with relevant experience.

Without prejudice to the generality of the foregoing, MANAGER shall, on behalf of and for the benefit of OWNER, from the date hereof and (unless this Management Agreement is terminated under the terms hereof), during the design, construction and completion of the Vessels, during any period of a Transportation Contract, during any transit, mobilisation to- or demobilisation from a loading/discharge location, during any period of lay-up, and during any inspection and/or repair:-

2.1      Supervision of Vessels design, construction and completion, as well as design development

Supervise the design, construction and completion of the Vessels, and supervise the design, construction, outfitting and installation of equipment, testing, certification, completion of documentation of the Vessels, including but not limited to:-

2.1.1    establish a project organisation with qualified and experienced personnel to supervise the construction of the Vessels,

2.1.2    procure all design and engineering work required to further develop the Vessels to complete semisubmersible heavy transportation vessels, including the establishment of performance requirements, and in this respect procure outline drawings, specifications, equipment lists and other basic engineering documentation necessary to professionally market the Vessels for Transportation Contracts,



2.1.3    communicate with the relevant classification society (Det Norske Veritas) and all relevant authorities to ensure their approval, certification and/or consent as required,

2.1.4    arrange for design verification to be carried out as appropriate and evaluate professionally and based on experience, any design with respect to safety, operational reliability, operational efficiency, maintenance friendliness, economy, workplace environment and accommodation comfort,

2.1.5    initiate and arrange for any necessary activities, other than those otherwise set forth in this Sub-Clause 2.1 to have the Vessels, including equipment made suitable for the purpose, and appropriately outfitted, tested and commissioned,

2.1.6    check and approve plans and drawings for the Vessels in accordance with the Building Contract, any purchase contract(s) for equipment to be furnished and/or procured by OWNER, in accordance with good vessel management practice,

2.1.7    supervise that the construction of the Vessels, equipment installation and completion of the Vessels is carried out according to the terms of the Building Contract and to approved plans and specifications and in a professional manner, exercising good workmanship,

2.1.8    advise on the validity of claims for installments and any Force Majeure claims under the Building Contract, purchase contract(s) for equipment to be furnished and/or provided by OWNER, and any other relevant contract(s),

2.1.9    attend tests and trials. MANAGER shall not accept the Vessels following final tests and trials under the Building Contract unless this has been authorised by OWNER in writing,

2.1.10    control and verify that the Builder and any supplier or contractor being furnished and/or provided by OWNER, maintain a Quality Assurance System pursuant to the requirement of the Building Contract and ensure that the Vessels is properly documented for operation.

In his performance of the duties specified above, MANAGER shall not intentionally cause any unnecessary delays to the design and construction activities, and MANAGER shall exercise due diligence to avoid such delays.

2.2    Marketing

MANAGER shall, in consultation with OWNER prepare a marketing strategy which describes the size of the market, the number of potential customers, and the economic variables associated with the different types of transport contracts available to OWNER on both a short term and long term basis. The marketing strategy shall be reviewed on a quarterly basis by the management of OWNER and MANAGER.

2.3    Negotiation of Transportation Contracts

In consultation with OWNER negotiate Transportation Contracts, and any other applicable contracts, for the Vessels, as well as associated services.

Manager shall not enter into any transportation contact without written approval of the Management Board of OWNER.



2.4    Management of Transportation Contracts

MANAGER shall provide management of Transportation Contracts which includes but is not limited to:-

(i)    provision of cost build ups and accounts and calculation of payments from clients and invoicing of same,

(ii)    arrangement of the proper payment to OWNER of all revenues or other monies of whatsoever kind to which OWNER may be entitled, arising out of the employment or otherwise in connection with the Vessels,

(iii)    ensuring compliance with all obligations imposed on OWNER and/or MANAGER by any Transportation Contract.

2.5    Income Collection

Prepare invoices in the name of OWNER for payments to the appropriate bank account(s), control payments of all income under all Transportation Contracts to such bank account(s), and collect for credit to such bank account(s) and/or account for all other amounts due to OWNER in respect of the Vessels. Such bank account(s) shall be designated by OWNER and, unless OWNER has assigned income in respect of the Vessels to any bank or other financial institution, in OWNER's name.



2.6    Operation of the Vessels

Prior to the completion of the Vessels, prepare for, and after completion of the Vessels, perform management of the Vessels, including arrangement for everything required for proper functioning of the Vessels. in accordance with sound vessel management practises and appropriate Quality Assurance standards, such as to:-

2.6.1    ensure compliance with any manuals or instructions or recommendations of manufacturers of parts or other equipment in respect of the Vessels,

2.6.2    arrange for replacement, spare parts, stores, consumables, provisions, fuels and lubricants, cribbing and seafastening equipment, as well as any other transportation related equipment and services,

2.6.3    issue voyage instructions on the basis of any Transportation Contract as provided for in Sub-Clause 2.4 above,

2.6.4    make any necessary arrangements with respect of any requirement to survey the cargoes,



2.6.5    arrange for inspections, maintenance and repairs, and docking of the Vessels and supervision thereof,

2.6.6    maintain the Vessels' classification and procure and/or maintain all certificates required by the relevant classification society and by all relevant authorities, and

2.6.7    in MANAGER's option in cooperation with a sub-manager according to Sub-Clause 5.1, do everything required for a proper manning of the Vessels, including but not

limited to, making all arrangements for the selection, appointment, employment dismissal, welfare, training and remuneration of all necessary personnel (hereinafter referred to as the "Crew") for the Vessels, and the fixing of the Crew's number and their conditions of service in accordance with relevant laws, regulations and otherwise MANAGER's practice. The Crew shall be engaged in OWNER's name and be employees of OWNER.

2.7    Safety and Compliance with Law

Conduct the operation mentioned in Sub-Clause 2.6 in a safe manner and in compliance with all applicable laws and regulations in any area of operations, flag state requirements and MANAGER's safety programmes.

2.8    Insurances



Procure and maintain adequate insurance cover, with the prior written approval of OWNER with reputable insurers in the names of OWNER and MANAGER (as their interest may appear) in respect of the Vessels and their Crew, and any liability to third parties, as generally maintained by prudent owners and first class operators of vessels, including without the generality of the foregoing:-

2.8.1    insurance against usual marine and war risks, Hull and Machinery, and Hull Interest Insurance, if applicable, for the full value (minimum) of the Vessels as stated by OWNER in writing,

2.8.2    customary Protection and Indemnity Insurance,

2.8.3    to the extent not covered under Sub-Clause 2.8.2 above, adequate insurance of employer's liability in respect of the Crew,

2.8.4    if and to the extent requested by OWNER in writing, Loss of Hire Insurance and/or Loss of Contract Insurance for the Vessels, and

2.8.5    all such insurance as may be required by OWNER and/or MANAGER under any Transportation Contract,

provided that MANAGER shall consult with OWNER (any verbal consultation shall be confirmed in writing) in respect of initial insurance cover, or renewal of insurance policies on substantially different terms to existing policies, at least 30 (thirty) business days prior to such policies coming into effect or being renewed.

2.9    Insurance Claims



Make and prosecute claims under or in respect of any insurance cover maintained pursuant to Sub-Clause 2.8. At all times in making such claims, MANAGER shall observe any instruction from OWNER, and at no time shall MANAGER initiate litigation, take any material action or course of litigation, make any admission or waive any right or agree or purport to agree to settle or compromise any claim on behalf of OWNER for any single amount in excess of USD 500,000 without OWNER's prior written approval.



### 2.10 Operational Claims

In consultation with OWNER, pursue or waive, accept or reject claims from third parties that may arise in connection with the operation and maintenance of the Vessels during the term of this Management Agreement, provided that OWNER's written approval shall be obtained before any single claim in excess of USD 100,000 is compromised by waiver of payment.

### 2.11 Payment of Wages, etc.

Arrange for payment of wages, and carry out all duties incumbent on an employer with regards to official reports, withholding of taxes, payment of payroll tax and similar duties in respect of the Crew.

### 2.12 Budget Procedure

2.12.1   MANAGER shall within 60 days of the date of this Management Agreement prepare and deliver to OWNER for his approval, a budget (based on generally adopted budget principles) for costs and expenses to be incurred under this Management Agreement from the date thereof and until the Vessels are delivered (hereinafter referred to as the "Delivery Date") from Builder and which shall not, pursuant to the provision hereof, be borne by MANAGER, and



2.12.2   MANAGER shall, after consultation with OWNER and not later than 30 days prior to the commencement of each financial year of OWNER, prepare and deliver to OWNER for his approval a budget (based on generally adopted budget principles) for the operation of the Vessels up to the commencement of the next budgeting period. This budget shall include all general and administrative expenses (G&A) relating to support services provided by the MANAGER.

### 2.13 Accounting and Reporting

On a quarterly basis, and not later than on the end of the following month, submit to OWNER:-

2.13.1   accounts for all costs and expenses incurred under this Management Agreement during the preceding month, which costs and expenses shall, pursuant to the provisions hereof, not be borne by MANAGER,

2.13.2   a budget and cost comparison statement, explaining any discrepancies and consequential remedial activities,

2.13.3   income forecast and liquidity budget,

2.13.4   a management report with a summary of the activities and/or operations in the preceding month(s) in a format to be agreed upon.

### 2.14 Company Books, Accounts and Records of OWNER

Maintain proper books, records and accounts in respect of OWNER and the Vessels, which books, records and accounts shall be available for audit by OWNER any time during normal business hours. Upon reasonable written request by OWNER, MANAGER will, at OWNER's

expense, supply to OWNER any extracts or copies of such books, records and accounts. If requested by OWNER, MANAGER shall procure that suitably qualified personnel provide reasonable detailed explanation to such books, records and accounts. Such maintenance shall include all corporate books, minutes and notice for board meetings and general meetings of OWNER, if applicable.

### 2.15 Reporting of Major Events

Promptly after he has knowledge thereof, MANAGER shall give written notice to OWNER of:-

2.15.1 any event or condition which may materially effect the progress of the Vessels' construction or completion, or the cost budget pursuant to Sub-Clause 2.12.1,

2.15.2 the occurrence of any default by any parties under any contract involving the Vessels,

2.15.3 the occurrence of an event or condition which may permit any party under a contract in respect of the Vessels, including any Transportation Contract, to terminate such contract, or place the Vessels in a materially reduced- or zero rate for a period exceeding 20 days.

2.15.4 a total loss of the Vessels or damage requiring repairs, where the overall cost is likely to exceed the amount stipulated in Sub-Clause 2.9,

2.15.5 loss and/or damage to any cargo under the ownership of others and which is likely to exceed USD 500,000 and where MANAGER has reason to believe that the owner of such cargo may seek compensation under the Vessels' insurance coverage hereunder or despite the fact that MANAGER shall make all endeavours to enter into Transportation Contracts based on the "knock-for-knock" principle. Such written notice shall also be directed to Vessels' applicable insurers.

### 2.16 Quality Assurance

Any appropriate Quality Assurance principles and procedures for all of MANAGER's activities described herein. During normal business hours and upon prior written request by OWNER, OWNER shall have the right to perform quality audits of MANAGER's Quality Assurance systems and practices.

3.0 Cost and Expenditures

MANAGER shall be authorised to incur on OWNER's behalf and for the account of OWNER, all agreed budgeted costs and expenses incurred under this Management Agreement, which, pursuant to the provisions hereof, shall not be borne by MANAGER, including but not limited to:-

3.1 All documented costs incurred in the period after the date of this Management Agreement and until the Delivery Date, such as:-

3.1.1 agreed cost for supervision of design, construction and completion of the Vessels under the Building Contract, cost for procurement of design and engineering work for further developing the Vessels, cost for supervision of the design of, procurement to, installation of, and outfitting, construction, testing and completion of the Vessels under the Building Contract, including the negotiation thereof, including compensation to any sub-manager as per Sub-Clause 5.2, and for all documented costs incurred by said sub-manager(s),




3.1.2  all compensation to consultants, experts and any sub-contractor engaged in respect of design, engineering, etc.,

3.1.3  cost of project organisation and site team(s), other than personnel costs provided for in Sub-Clause 3.1.1 above, including traveling, board and lodging, and

3.1.4  costs pursuant to Sub-Clause 3.2 through 3.10 below which have not been incurred prior to the Delivery Date, which are not covered by Sub-Clauses 3.1.1 through 3.1.4.

3.2  cost for wages, recruitment expenses, social expenses, traveling and employee expenses of, and costs of direct and indirect benefits that are granted to the Crew,

3.3  costs in respect of purchase of supplies, bunkers, equipment and other parts, including storage, transport and assembling thereof,

3.4  cost of catering,

3.5  cost of repairs and periodic overhauls, maintenance and docking, if applicable,

3.6  costs related to lay-up,

3.7  insurance premiums,

3.8  taxes and charges not paid by OWNER, provided properly evidenced,

3.9  all others costs and expenses related to or in connection with the management and/or operation of the Vessels, which shall not, pursuant to the provisions hereof, be borne by MANAGER,

3.10  notwithstanding the provisions of Sub-Clauses 3.1 through 3.10, a special Approval for Expenditure ("AFE") Form shall apply for relevant purchases as described therein.

4.0  Encumbrances; OWNER's Equipment.

4.1  Encumbrances

MANAGER shall not create or incur or suffer to be created or to exist any mortgage, lien, claim, charge or security interest of any kind of the Vessels, except for mortgage or negative pledge related to ordinary loan financing purposes in respect of the Vessels, and liens that may arise as a matter of law in the ordinary course of operation and maintenance of the Vessels, with MANAGER procuring that such liens are released as soon as practicable by payment on behalf of OWNER of all relevant sums due to the holder(s) of such lien(s).



4.2  OWNER's Equipment

MANAGER shall not dispose of any item of OWNER's equipment on the Vessels or owned by OWNER having a value in excess of USD 25,000 for any single item without the prior written consent of OWNER.

5.0  Employment of Sub-Managers and Agents

5.1  Subject to any limitation in the Building Contract or other contract(s) in respect of the Vessels, MANAGER shall in connection with the performance of his duties and obligations under this Management Agreement, without prejudice to the generality of the powers vested in him as aforesaid, be entitled, but not bound, to:-

5.1.1  employ, subject to OWNER's prior written approval, which approval shall not be



unreasonably withheld, any insurance brokers as he may deem fit,

    5.1.2   engage, subject to OWNER's prior written approval, which shall not be unreasonably withheld, sub-manager(s) for the performance of specific assignments, including but not limited to:-

        (i) a sub-manager for the supervision during the building phase of the Vessels, and

        (ii) a sub-manager for all the crewing related activities for the Vessels during operation and during any period of lay-up

    5.1.3   obtain legal advice in relation to any disputes or other legal matters affecting the interests of OWNER in respect of the Vessels,

provided, however, that in the event of any delegation to a sub-manager, agent, broker or consultant, MANAGER shall in all respects be responsible to OWNER for the due performance by any such sub-manager, Agent, broker or consultant of any of the services so delegated.

**6.0   Payment and Cash Availability**

    6.1   All expenses must be authorized. The following approval authority levels shall apply for any purchase order. The levels reflect the aggregate of individual commitments, and any artificial splitting of a purchase order to remain within a stated level is not acceptable:-



|  |  | Budgeted | Non-budgeted |
|---|---|---|---|
| Fairmount Financial Director | up to USD | 50,000 | 25,000 |
| Fairmount Managing Director | up to USD | 500,000 | 100,000 |
| FHT CEO | up to USD | 750,000 | 250,000 |
| FHT Board | in excess of USD | 750,000 | 250,000 |

    6.2   MANAGER is entitled to make payments on behalf of OWNER, directly from OWNER's account, provide that the following conditions are met:
       •  Expenses are authorized according to the approval authority levels as described in Article 6.1; and
       •  MANAGER's payment approval policy is adhered to for these payments: i.e. MANAGER's Financial Director will prepare payments and MANAGER's CEO will approve payments. Alternatively, two of the following people: the MANAGER's Financial Director, Managing Director or OWNER's CFO, together can make a payment.

**7.0   Good Conduct**

During the term of this Management Agreement, MANAGER shall not manage or supervise the construction of or perform marketing of comparable vessels owned by owners not associated with OWNER. MANAGER shall ensure that marketing and operation of the Vessels is conducted in a professional and businesslike manner with due regards to ethical standards.

**9.0   Change of Registry**

For the purpose of operating the Vessels as efficiently as possible, change of registry of the Vessels may become necessary from time to time, which shall be subject to OWNER's prior written approval.



10.0    Management Fee

    10.1    OWNER shall pay MANAGER for his services as manager under this Management Agreement, as provided for herein, a Management Fee, which MANAGER shall be entitled to as follows:-

        10.1.1    USD 565 per day per Vessel from 4th April 2006 until the Delivery Date.

        10.1.2    USD 900 per day per Vessel from the Delivery Date and thereafter and until the termination of this Management Agreement pursuant to the terms hereof.

        10.1.3    Notwithstanding the provisions of Sub-Clause 10.1.2, during any period of lay-up, which herein is defined as 30 days or more prior to the commencement of any Transportation Contract and 30 days or more after the completion of any Transportation Contract, the Management Fee shall be reduced to USD 730 per day per Vessel.

    The Management Fee as per Sub-Clauses 10.1.1 through 10.1.3 above shall be payable monthly in advance by OWNER. The Management Fee pursuant to Sub-Clauses 10.1.2 and 10.1.3 shall be adjusted; first time on the Delivery Date and thereafter every 1 January, with USD 66 per day per Vessel.



        10.1.4    In addition to the above Management Fee, MANAGER is entitled to, and OWNER shall pay:-

        10.1.4.1    in the event of a sale of one or both of the Vessels, and provided that such sale does not take place as a part of a liquidation, winding up or dissolution of OWNER (in the event no fee shall be payable), a Termination Fee of US$ 1,000,000 per Vessel shall be paid by OWNER to MANAGER upon receipt of the purchase money.

        10.1.4.2    for entering into any Transportation Contract, a fee of 0.825% of the contract value thereunder for marketing the Vessels, ie tendering, negotiating and execution of Transportation Contracts, payable by OWNER when the lumpsum transportation amounts have been received by OWNER thereunder.

        10.1.4.3    in the event of (i) a corporate consolidation, including but not limited to a transfer of shares, or voting rights or the subscription of shares, a merger or demerger, as a result of which one or more third parties acquiring direct or indirect control of the OWNER, including negative control, and (ii) the subsequent termination of the Management Agreement, OWNER will pay MANGER a termination fee of US$ 2,000,000.

    10.2    MANAGER shall credit OWNER with any return commissions, discounts, rebates and the like in connection with insurances, purchases, hirings and other transactions effected hereunder in connection with the Vessels and MANAGER's work hereunder.

11.0    Consultation

    Upon written request by OWNER, MANAGER shall consult with OWNER on any aspect of the management of the Vessels including any decision or proposed decision arising in the course of the management of the Vessels.

12.0    Termination

    12.1    This Management Agreement has a duration of five years from the Delivery Date, however, may be terminated by OWNER and MANAGER, respectively, on the following terms and conditions:-

    12.2    In the event of termination by

        (i)      OWNER pursuant to Sub-Clause 12.1, or
        (ii)     MANAGER due to OWNER having failed to make necessary funds available to

C7

MANAGER in advance under the provisions of Clause 6, above, in which event MANAGER has the right to cancel this Management Agreement after having given OWNER 10 (ten) days prior written notice thereof, or in the event of termination due to, or

(iii)     sale of the Vessels, or

(iv)     loss of the Vessels (total loss or compromised total loss), or

(v)      OWNER in the event of a situation as described in Article 10.1.4.3.

MANAGER shall be entitled to receive from OWNER the Management Fee stated in Sub Clauses 10.1.2 and 10.1.4.2 for an additional period of three months from the date when such termination becomes effective. In the case of termination pursuant to item (iii) above, OWNER shall also pay MANAGER the fee stated in Sub-Clause 10.1.4.1. In the case of termination pursuant to items (ii) and (v) above, OWNER shall pay MANAGER the fee stated in Sub-Clause 10.1.4.3.



12.3   OWNER may cancel this Management Agreement if MANAGER materially fails to perform his duties and obligations hereunder in accordance with the provisions hereof, after first having given MANAGER 5 (five) days to remedy such failure and then having failed to remedy, in which case OWNER may give written notice of termination for cause, effective upon receipt, and MANAGER shall, upon such notice being given, receive any unpaid part of MANAGER's remuneration hereunder for a period up to the date of OWNER's written notice, less any amount rightfully due to OWNER at such time which OWNER may thus set off.

12.4   Unless OWNER has sound and valid reasons to claim that MANAGER is performing his duties inadequately and not looking after OWNER's interests in the best way possible, as is expected from a first class management company, OWNER shall not terminate this Management Agreement under Sub-Clause 12.1 with the sole intention of awarding a management contract to another manager.

12.5   Notwithstanding the provisions of sub-clause 12.4, OWNER has the right to terminate this Management Agreement without cause and for his own convenience after five years by giving MANAGER a minimum of 180 days prior written notice thereof.

12.6   If a change of control of the MANAGER occurs, OWNER has a one-time opportunity to terminate this Management Agreement exactly six (6) months after the change of control date (Transition Period), without paying a Termination Fee. OWNER will give MANAGER a minimum of 180 days prior written notice of termination, starting from the end of the six month Transition Period.



13.0 Governing Law and Jurisdiction

13.1   This Management Agreement is governed by and shall be construed in accordance with Dutch law.

13.2   Each Party agrees that all disputes arising out of or in connection with this Management Agreement, or any further agreement(s) or contract(s) resulting from or executed in pursuance hereof shall, after the parties have endeavoured to resolve such dispute(s) amicably, be submitted to arbitration Rotterdam, the Netherlands by three arbitrators, to be appointed jointly by the parties.

14.0 Indemnity

Provided that MANAGER acts in accordance with the provisions of this Management Agreement and/or instructions of OWNER and/or any applicable laws and regulations, OWNER hereby ratifies and confirms and undertakes at all times to ratify and confirm whatever may be done or caused to be done by MANAGER in the provision of the services referred to herein, and OWNER hereby undertakes to keep MANAGER indemnified and harmless against all actions, proceedings, claims, demands, liabilities whatsoever which may be brought against or incurred by MANAGER in relation to any and everything done or caused to be done by MANAGER as aforesaid and against all costs,

damages and expenses which MANAGER may suffer or incur in defending or settling the same, howsoever caused, except insofar as the same is proved solely to be the result of MANAGER's willful misconduct or gross negligence, save where the same is recoverable under any insurances of OWNER or in respect of the Vessels.

15.0    Liability

15.1    Save for the extent of liability as is expressly undertaken by MANAGER pursuant to Sub Clause 15.2. OWNER hereby acknowledges that OWNER himself has full and sole responsibility for design and engineering of, procurement of equipment to, installation on, and outfitting, construction, testing and completion, including supervision thereof, of the Vessels, and acknowledges that no liability or other responsibility shall attach to MANAGER in relation thereto, including fitness for use, or condition of, the Vessels.

15.2    MANAGER shall have no liability or responsibility to OWNER, nor will OWNER hold MANAGER liable or responsible for or in respect of any matter or thing arising, as a consequence of, or in connection with, the performance by MANAGER of the services provided herein, except insofar as the same is proved solely to be the result of MANAGER's willful misconduct or gross negligence, save where the same is recoverable under any insurances of OWNER or in respect of the Vessels.

16.0    Survival of Provisions

The provisions of Clauses 14 and 15 shall survive cancellation or termination of this Management Agreement, howsoever caused.

17.0    Force Majeure

Neither OWNER nor MANAGER shall be under any liability for any failure to perform any of their obligations hereunder by reason of any cause whatsoever of any nature or kind beyond their reasonable control and which should reasonably have been foreseen as of the date of this Management Agreement.

18.0    OWNER's Duties to inform

18.1    Information to MANAGER

OWNER will provide MANAGER with one copy of the Building Contract and shall forthwith and hereafter submit to MANAGER all other relevant information which MANAGER needs to have access to in order to fulfill his obligations hereunder.

18.2    Information to the Builder

OWNER shall as soon as practicable after the date of the Building Contract advise Builder that MANAGER has been appointed by OWNER to supervise the design and construction of the Vessels on OWNER's behalf, and the extent of MANAGER's authority in this respect. OWNER shall at all times procure and ensure that MANAGER receives such information and has such rights of supervision and access as are available to OWNER under the Building Contract.

18.3    Builder to send Plans and Drawings, etc., to MANAGER

OWNER will procure that copies of plans and drawings and other technical information, as relevant, are sent by the Builder to MANAGER at his relevant address, or such office that MANAGER may designate.

19.0    Notices

19.1    Unless otherwise instructed, any notice hereunder to OWNER shall be sent to:-

Fairmount Heavy Transport NV



Beurs World Trade Center # 1459
PO Box 30239
3001 DE Rotterdam
The Netherlands

Phone +31 10 4051290
Telefax +31 10 4055029
E-mail fairmount@fairmount.nl

For the attention of Mr. Philip Adkins, CEO

19.2 Unless otherwise instructed, any notice hereunder to MANAGER shall be sent to:-

Fairmount Marine BV
Beurs World Trade Center # 1459
PO Box 30239
3001 DE Rotterdam
The Netherlands

Phone +31 10 4051290
Telefax +31 10 4055029
E-mail fairmount@fairmount.nl

For the attention of Mr. Henk J. van den Berg

19.3 Notices required to be given in writing shall be given by letter in the English language and may be given by letter, telefax or e-mail.

## 20.    Appendices

As soon as practically, the following five appendices will be added to this Management Agreement:-

1.    Specification of the VESSELS
2.    MANAGER Organization
3.    Project Organization
4.    VESSELS Crew (Operating and Lay-Up)
5.    APE Form

This Management Agreement is made in the English language in two originals, one for each party.

Rotterdam, __20 - 7 -__ 2006

Fairmount Heavy Transport NV                    Fairmount Marine BV

Philip Adkins                    Henk van den Berg

Seven World Trade Center # 1459
PO Box 30239
3001 DB Rotterdam
The Netherlands

Phone +31 10-4851290
Telefax +31 10-4926920
E-mail fairmount@fairmount.nl

For the attention of Mr. Philip Adkins, CEO

19.2 Unless otherwise instructed, any notice hereunder to MANAGER shall be sent to:-

Fairmount Marine BV
Seven World Trade Centre # 1459
PO Box 30239
3001 DB Rotterdam
The Netherlands

Phone +31 10-4851290
Telefax +31 10-4926920
E-mail fairmount@fairmount.nl

For the attention of Mr. Henk J. van den Berg

19.3 Notices required to be given in writing shall be given by letter in the English language and may be given by telex, telefax or e-mail.

20.    Appendices

As soon as practicable, the following five appendices will be added to this Management Agreement:-

1.    Specification of the VESSELS
2.    MANAGER Organisation
3.    Project Organisation
4.    VESSELS Crew (Operating and Lay-Up)
5.    ABS Form

This Management Agreement is made in the English language in two originals, one for each party.

Rotterdam: 20 - 7 -         2006

Fairmount Heavy Transport NV
Philip Adkins

Fairmount Marine BV
Henk van den Berg

Page 14 of 14

# EXHIBIT 2

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
FAIRSTAR HEAVY TRANSPORT NV,                     :
                                                 :
                      Plaintiff,                 :        08 Civ.
                                                 :
       - against -                               :
                                                 :
FAIRMOUNT MARINE B.V.,                           :
                                                 :
                      Defendant.                 :
-------------------------------------------------------------------X

## AFFIDAVIT IN SUPPORT OF PRAYER FOR MARITIME ATTACHMENT

State of Connecticut   )
                       )      ss: Town of Southport
County of Fairfield    )

       Charles E. Murphy, being duly sworn, deposes and says:

       1.     I am a member of the Bar of this Court and represent the Plaintiff herein. I am

familiar with the facts of this case and make this Affidavit in support of Plaintiff's prayer for the

issuance of a Writ of Maritime Attachment and Garnishment, pursuant to Rule B of the

Supplemental Admiralty Rules of the Federal Rules of Civil Procedure.

## DEFENDANT IS NOT PRESENT IN THE DISTRICT

       2.     I have attempted to locate the Defendant, FAIRMOUNT MARINE B.V., within

this District. As part of my investigation to locate the Defendant within this District, I checked

the telephone company information directory, as well as the white and yellow pages for New

York listed on the Internet or World Wide Web, and did not find any listing for the Defendant. I

also performed a Google search on the Internet. Finally, I checked the New York State

Department of Corporations' online database which showed no listings or registration for the

Defendant. *See search results of New York State Department of Corporation's online database attached as Exhibit 1.*

3. I submit based on the foregoing that the Defendant cannot be found within this District within the meaning of Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims.

4. Upon information and belief, the Defendant has, or will have during the pendency of this action, tangible and intangible property within this District and subject to the jurisdiction of this Court, held in the hands of in the hands of garnishees within this District, which are believed to be due and owing to the Defendant.

## PRAYER FOR RELIEF FOR ORDER ALLOWING SPECIAL PROCESS SERVER

5. Plaintiff seeks an Order pursuant to Rule 4(c) of the Federal Rules of Civil Procedure, for an Order appointing Patrick F. Lennon, Kevin J. Lennon, Charles E. Murphy, Nancy Peterson or any other partner, associate, paralegal or agent of Lennon, Murphy & Lennon, LLC, or any process server employed by Gotham Process Servers, be and is hereby appointed, in addition to the United States Marshal, to serve the Process of Maritime Attachment and Garnishment and/or the Verified Complaint, together with any interrogatories, upon the garnishee(s), together with any other garnishee(s) who (based upon information developed subsequent hereto by the Plaintiff) may hold assets of, for or on account of, the Defendant.

6. Plaintiff seeks to serve the prayed for Process of Maritime Attachment and Garnishment with all deliberate speed so that it may be fully protected against the potential of being unable to satisfy a judgment/award ultimately obtained by Plaintiff and entered against the Defendant.

7. To the extent that this application for an Order appointing a special process server

-3-

with respect to this attachment and garnishment does not involve a restraint of physical property, there is no need to require that the service be effected by the Marshal as it involves simple delivery of the Process of Maritime Attachment and Garnishment to the various garnishes to be identified in the writ.

## PRAYER FOR RELIEF TO SERVE LATER IDENTIFIED GARNISHEES

8.   Plaintiff also respectfully requests that the Court grant it leave to serve any additional garnishee(s) who may, upon information and belief obtained in the course of this litigation, to be holding, or believed to be holding, property of the Defendant, within this District. Obtaining leave of Court at this time to serve any later identified garnishees will allow for prompt service of the Process of Maritime Attachment and Garnishment without the need to present to the Court amended Process seeking simply to identify other garnishee(s).

## PRAYER FOR RELIEF TO DEEM SERVICE CONTINUOUS

9.   Further, in order to avoid the need to repetitively serve the garnishees/banks, Plaintiff respectfully seeks further leave of the Court, as set out in the accompanying Ex Parte Order for Process of Maritime Attachment, for any process that is served on a garnishee to be deemed effective and continuous service of process throughout any given day on which process is served through the next day, provided that process is served the next day, to authorize service of process via facsimile or e-mail following initial *in personam* service.

–3–

## PRAYER FOR RELIEF TO TEMPORARILY SEAL CASE

10.     Upon information and belief, it is the practice of many law firms in the maritime bar to review the daily electronic docket sheet of the Southern District of New York for all maritime actions filed in the district and inform the defendant(s) named therein of any Ex Parte Orders of Attachment pending against them, thus defeating the purpose of the "Ex Parte" application.

11.     Upon information of belief, it is the practice of certain publications, specifically Tradewinds, to publish the names of defendants named in Ex Parte Orders of Attachment, thus further defeating the purpose of the "Ex Parte" application.

12.     Upon information and belief, Tradewinds has very recently publicized the names of parties in Rule B proceedings, the amount of the attachments, and other details of the actions, thereby further defeating the purpose of the "Ex Parte" application.

13.     The Courts within the Southern District of New York have an interest in preserving the efficacy of the Ex Parte Orders issued therein.

14.     The above interest supersedes the interest in maintaining a completely public docket, especially given that the public's access will only be limited temporarily until assets are attached and notice of attachment has been provided to the Defendant.

15.     Indeed, the public's access to Ex-Parte Orders of Maritime Attachment defeats their entire purpose, by depriving Plaintiffs of the element of surprise and potential allowing Defendant to re-route their funds to avoid the attachment, thus making the attachment remedy hollow.

-4-

16. For the foregoing reasons, Plaintiff requests that the Court issue an Order temporarily sealing the court file in this matter, including the Verified Complaint and all other pleadings and Orders filed and/or issued herein until further notice of this Court or notification to the clerk that property has been attached.

17. This request is narrowly tailored to meet Plaintiff's needs. Once property is attached, the case should be unsealed, as the interest underlying sealing the case will have been largely eliminated.

Charles E. Murphy

Sworn and subscribed to before me
This 5th day of August 2008.

Notary Public

−5−

# EXHIBIT 1

   

# Department of State

## Division of Corporations

### Search Our Corporation and Business Entity Database

The Corporation and Business Entity Database includes business and not for profit corporations, limited partnerships, limited liability companies and limited liability partnerships, as well as other miscellaneous businesses. This information is best viewed with Netscape Navigator 7.0 and above or Internet Explorer 6.0 and above. Please note that the database does not include corporate or other business entity assumed names filed pursuant to General Business Law, §130. Assumed name filings are filed and maintained by the Division of Corporations for corporations, limited liability companies and limited partnerships. Although maintained by the Division of Corporations, searches of records of assumed names used by corporations, limited liability companies and limited partnerships must be made by a written, faxed or e-mail request to the Division. All other entities such as general partnerships, sole proprietorships and limited liability partnerships file an assumed name certificate directly with the county clerk in each county in which the entity conducts or transacts business.

Every effort has been made to ensure that the information contained on this site is up to date and accurate. As the Department relies upon information provided to it, the information's completeness or accuracy cannot be guaranteed. If you have any questions about performing a search or the results you receive, please contact the NYS Department of State, Division of Corporations at (518) 473-2492, Monday - Friday, 8:30 a.m. - 4:30 p.m.

The information contained in this database is current through August 04, 2008.

Search Criteria

Entity Name *  fairmount

Name Type *  Active Only

Search Type *  Begins With

The items marked with * are required.

Search the Database

To search the database do the following:

1. Enter the Corporation or Business Entity Name being searched for.
2. Select a Name Type.
3. Select a Search Type.
4. Tab to Search the Database and press the enter key or click Search the Database.

Additional Search Instructions

Division of Corporations, State Records and UCC Home Page    NYS Department of State Home Page

# NYS Department of State

## Division of Corporations

**Search Results**

A total of 25 entities were found.

**Entity Name**

FAIRMOUNT ANIMAL HOSPITAL P.C.
FAIRMOUNT AQUARIUM & WATER GARDENS, LLC
FAIRMOUNT AUTOMOTIVE SERVICE, INC.
FAIRMOUNT AVE LLC
FAIRMOUNT BOYS, INCORPORATED
FAIRMOUNT CAPITAL MANAGEMENT, L.L.C.
FAIRMOUNT CAPITAL PARTNERS, L.P.
FAIRMOUNT CARPET & LINOLEUM, INC.
FAIRMOUNT CENTER, INC.
FAIRMOUNT COMMUNITY CIRCLE, INC.
FAIRMOUNT CORPORATION
FAIRMOUNT COURT, LLC
FAIRMOUNT DEVELOPMENT, INC.
FAIRMOUNT ESTATES, INC.
FAIRMOUNT FAIR MERCHANTS ASSOCIATION, INC.
FAIRMOUNT FAMILY MEDICINE, PLLC
FAIRMOUNT HOUSING CORP.
FAIRMOUNT KIDS CHRISTIAN DAY CARE CENTER LLC
FAIRMOUNT OAKS HOMEOWNERS ASSOCIATION INC.
FAIRMOUNT PARK LLC
FAIRMOUNT PLAZA, LLC
FAIRMOUNT PROPERTIES, INC.
FAIRMOUNT PROPERTIES, LLC
FAIRMOUNT REALTY SERVICES, LLC
FAIRMOUNT-WEST GENESSE COMMUNITY COUNCIL, INC.

Page 1 of 1, Entities 1 to 25

The Entity Name column contains the entity names that were found
based on your search criteria. To display information for an entity, tab to

the entity name and press the enter key or click on the entity name. To
revise your search criteria, tab to Revise Search Criteria and press the
enter key or click on Revise Search Criteria. To start a new search, tab to
New Search and press the enter key or click on New Search.

Revise Search Criteria          New Search

Division of Corporations, State Records and UCC Home Page    NYS Department of State Home Page